GRAND RAPIDS BEDDING CO. *v.* GRAND RAPIDS
FURNITURE TEMPLE CO.

CUSTOMS AND USAGES—NOTICE—EVIDENCE—SUFFICIENCY—DIRECTED
VERDICT.

> In an action by a tenant against the owner of a building
> for the amount of an award paid by plaintiff under the
> workmen's compensation act, where the issue was as to
> whether there was a custom, of which defendant had
> notice, of leaving the elevator door partly open on the
> ground floor as an invitation to its tenants and their
> employees to use same, evidence of such custom, *held*, in-
> sufficient to take said question to the jury.

Error to Kent; Brown (William B.), J.    Submitted
June 12, 1923.    (Docket No. 137.)    Decided July 19,
1923.

Assumpsit by the Grand Rapids Bedding Company
against the Grand Rapids Furniture Temple Company
for the amount of an award against plaintiff under
the workmen's compensation act.    Judgment for plain-
tiff.    Defendant brings error.    Reversed.

*Stevens T. Mason*, for appellant.

*Lombard, McIntyre & Post*, for appellee.

SHARPE, J.    A verdict and judgment in favor of the
plaintiff on a former trial of this case was reviewed
in 218 Mich. 486.    The facts are therein stated and
need not be here repeated.    The case has been again
tried, resulting in a verdict for plaintiff for $2,691.
At the conclusion of plaintiff's proofs, defendant's
motion for a directed verdict was denied.

In the former opinion it was said as to the conduct
of Mr. Mulzer:

On liability for injury to elevator passenger stepping into
shaft through open door, see notes in 25 L. R. A. 33; 2 L. R.
A. (N. S.) 756; L. R. A. 1915D, 731.

"Such utter disregard for his own safety, such carelessness and recklessness constituted contributory negligence as matter of law."

It was further said:

"But plaintiff insists there was a custom prevailing in the building of permitting the tenants and their employees to operate the elevator and of leaving the doors partly open when the elevator was at the ground floor. If there was a custom of leaving the doors of the elevator a few inches open only when the elevator was at the ground floor, if an opening of a few inches in the doors was notice that the elevator was there, if it was an invitation to enter and use the elevator, and this was the established custom and of it defendant had notice, then we think the questions of defendant's negligence and of deceased's contributory negligence become questions for the jury."

The testimony supporting the claim of custom was said to be "of the most meagre sort" and—

"that it did not establish so notorious a custom as that we can say as matter of law that defendant had notice of it, nor was there testimony of actual notice."

To relieve the deceased of negligence, it must appear, under the rule stated, that there was a general practice among those who used the elevator in the absence of the operator to leave the doors partially open, to indicate that it stood at that floor; that such practice had existed for so long a time as to become, in law, a custom, of which the defendant was chargeable with notice. Plaintiff relies on the following testimony:

Gerard W. Brummeler, secretary and sales manager of plaintiff for 10 years, testified that he visited the building daily during sales season and frequently at other times. He *many times* operated the elevator himself.

"Usually at the ground floor, the gates sometimes would be open so it would be easy to step into the

elevator.    A few times found it locked.    That was the only two ways I would know.    *   *   *   Sometimes it would be a foot and sometimes two or three feet.    The back end of the elevator had mirrors so you could see.    *   *   *   With a foot apart, to get to the elevator, I just pushed them aside and stepped in. I found them in that condition a good many times. Probably one-third of the time.    *   *   *   I have seen them wide open.    *   *   *

"*Q.* On some occasions you find them closed and locked?

"*A.* Yes, sir.

"*Q.* And some other occasions clear open?

"*A.* Yes, sir.

"*Q.* And if I understand you right, about one-third of the time they would be so nearly closed you would have to open them some to get in?

"*A.* Yes, sir."

On cross-examination he said:

"And before pushing the doors apart, it was my custom to look and see whether the elevator was there. Naturally, anybody would.    I usually did.    *   *   * When I returned to the ground floor, I would shut them."

Amanda Mulzer, the widow of the deceased, who was with him at the time he fell, testified:

"*Q.* Had you ever seen them in that same position before?

"*A.* Yes, sir.

"*Q.* How frequently?

"*A.* A good many times.    I expected the elevator was there.

"*Q.* Had you seen him open them and step in the same way before?

"*A.* Yes, I had.

"*Q.* How frequently; what part of the time, as near as you can tell?

"*A.* Almost as many times as I have seen them closed."

Anthony E. Fox, treasurer of plaintiff company,

testified that he had operated the elevator when no one was there to do so.

"Sometimes the elevator was right there, and the doors would be open maybe full width and sometimes maybe partly closed.

"*Q.* Have you seen them when they would be not more than three or four inches open?

"*A.* Yes.

"*Q.* Was that frequently?

"*A.* Yes, if the elevator was there, it was often left that way."

On cross-examination he said:

"*Q.* Mr. Fox, what was the object in leaving the doors ajar?

"*A.* Well, I don't know what the object was, just to show that the elevator was there, you could get in there and open them up.    I suppose if the elevator was there you could open them up.

"*Q.* Why not leave them wide open?

"*A.* Well, they have done that.    I have seen them wide open when the light was in the elevator.    When the elevator was there, lots of times the door was open.    I say occasionally when the elevator was on the ground floor with the light on, the door would be open.

"*Q.* And when you were asked whether the elevator when it was at the ground floor would have the gates ajar and you said, 'No,' is that true or not, that is what we want to know?

"*A.* If that is the case, yes, sure, it was that way part of the time and part of the time it was opened up both ways.    I am telling you they were open, too. Would be open part of the time and closed part of the time.    I have seen this door open just three or four inches while the elevator was there and the elevator man not in charge.    I have seen it open different widths.

"*Q.* That would be a great exception though, wouldn't it?    It would not be the practice, the custom or anything like that?

"*A.* No, I don't think it would be the practice or custom.    They usually throw the doors shut when they leave the elevator.

"*Q.* The custom is there to have the doors wide open, or have them closed; isn't that it?

"*A.* Well, I have seen them closed and they would spring back a little. Close the doors quick and they would kind of jump back maybe two or three inches, and if they done that they would then go back and close them.

"*Q.* So that it would not be customary then to have them open two or three inches and leave them that way?

"*A.* Well, I don't know.

"*Q.* You would not leave them that way, would you?

"*A.* Well, no; I might leave them if I was in a hurry, close them quick and they spring back, not go back.

"*Q.* That would not be the regular customary thing to do?

"*A.* No, not the regular customary thing.   *   *   *

"*Q.* They wanted the doors closed; that was the rule?

"*A.* Yes, sure, it was a rule to have the doors closed; I suppose it was.

"*Q.* So the rule there was always to have those doors closed, wasn't it?

"*A.* I don't know that it would be the custom. *   *   *

"*Q.* So you have gone there and found the doors open three or four inches and the elevator not there and then you rang the bell?

"*A.* Yes, sir.

"*Q.* And then the elevator would come. How often would you say that you would go there and find the doors ajar and the elevator not there?

"*A.* Well, quite often, as many times I went over there."

Speaking of the doors springing open, he said:

"I have seen the operator go up a little ways and come back and shut the doors.

"*Q.* And have you seen them leave the elevator when the doors would bound open? I mean when the elevator is at the ground floor.

"*A.* Yes, sir."

This testimony was clearly insufficient to establish

the custom claimed to exist.    None of the witnesses who themselves operated the elevator testified that they were in the habit of leaving the doors partly open to indicate to others that the elevator was there standing.    The only conclusion that can be fairly reached is that the spring did not always hold when the doors were closed and the concussion would cause them to open more or less, dependent upon the force used in closing them.    There is not a scintilla of proof that any of defendant's officers or employees had any notice that the doors were even occasionally left partly open for any reason.

The motion of defendant's counsel for a directed verdict should have been granted.    The judgment is reversed and a new trial granted, with costs to defendant.

WIEST, C. J., and FELLOWS, McDONALD, CLARK, BIRD, MOORE, and STEERE, JJ., concurred.